The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| PLAY VISIONS, INC., a Washington corporation | Civil Action No. C09-1769MJP |
| Plaintiff, | |
| v. | DECLARATION OF MARK L. LORBIECKI |
| DOLLAR TREE STORES, INC., a Virginia corporation and GREENBRIER INTERNATIONAL, INC., a Delaware Corporation, | |
| Defendant. | |

I, Mark L. Lorbiecki, declare as follows:

I am the attorney representing plaintiff/counterclaim defendant Play Visions, Inc. ("Play Visions") in this action. I make the following statement in response to Defendants' motion for sanctions:

1.     Exhibit 1 is a true and accurate copy of excerpts of a 30(b)(6) deposition of Jay Keron as document custodian for plaintiff, Play Visions, Inc.

2.     Exhibit 2 is a true and accurate copy of Play Visions" Responses to Defendant's Second Requests for Production.

3.     Exhibit 3 is a true and accurate copy of Lorbiecki letter to Rheaume dated October 22, 2010 and inviting inspection of business records.

DECLARATION OF MARK LORBIECKI- 1

Civil Action No. C09-1769MJP

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

4.      Exhibit 4 is a true and accurate copy of an email from Lorbiecki to Goldmark dated November 4, 2010 informing Goldmark of the number of boxes available for inspection.

5.      Exhibit 5 is a true and accurate copy of an email from Goldmark to Lorbiecki dated November 4, 2010 agreeing to the meeting.

6.      Exhibit 6 is a true and accurate copy of an email from Lorbiecki to Goldmark dated February 14, 2011.

7.      Over the course of this case, Play Visions has produced documents as follows:

| Date | Bates Numbers |
|------|---------------|
| Wednesday, July 07, 2010 | PLVN 1-972 |
| Monday, October 25, 2010 | PLVN 973-2025 |
| Monday, November 22, 2010 | PLVN 2026-2790 |
| Tuesday, December 21, 2010 | PLVN 2791-2804 |
| Wednesday, December 22, 2010 | PLVN 2805-2861 |
| Thursday, January 20, 2011 | PLVN 2862-27904 |
| Wednesday, January 26, 2011 | PLVN 27905-39987 |
| Monday, January 31, 2011 | PLVN 39988-50884 |
| Thursday, February 10, 2011 | PLVN 50885-50940 |
| Friday, February 11, 2011 | PLVN 50953-52517 |
| Monday, February 14, 2011 | PLVN 52518-53280 |
| Tuesday, February 15, 2011 | PLVN 53281-53340 |
| Friday, February 18, 2011 | PLVN 53341-53375 |

8.      The meeting on the 11 of February is the pivotal point in this case. The Plaintiff demanded the meeting to resolve a number of issues relating to intent of the Defendants when initially purchasing the infringing products. In spite of admissions contained in the Answer, Defendants repeatedly resisted turning over any details of those similar cases. Additionally, one vendor had indicated to Play Visions that a buyer had specifically asked for duplicates of

DECLARATION OF MARK LORBIECKI- 2

Civil Action No. C09-1769MJP

PLVN-6-1001P41DEC_MLL

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

existing Play Visions products to purchase for Dollar Tree. Play Visions had specifically requested discovery of such emails, and the responses did not include any emails other than templates. After the parties agreed that they had reached a good faith impasse on the first issue, clearing the way for a motion, and Messrs. Rheaume and Goldmark averred that they had reviewed and found no such email, Mr. Rheaume began his assertion that further production was due from Plaintiff. He stated that it was too late in the game to produce and that the "case ought to go away". Mr. Rheaume went on to say that this case was getting very expensive.

9.     I specifically asked Mr. Rheaume if he was in a position to extend an offer that the case "go away". He stated that he had great influence with the clients and that in a month, he might not be able to do so. He then referred to Mr. Goldmark and asked Mr. Goldmark to affirm that Mr. Rheaume had just that influence. Mr. Goldmark agreed.

10.     Next, Mr. Goldmark requested the opportunity to inspect the several toys that had earlier been offered for inspection in response to a distinct Request for Production. Instead, I lent them to the Defendants and got a box for them to take the toys back their own office.

11.     Immediately, on Monday, I sent the email that is Exhibit 6, at 4:15, indicating that I did not yet have authorization to dismiss but had discussed the matter with my client. I explained that I would have a final answer within 24 hours. At 4:24, in the same email string, Mr. Rheaume responded thanking me for the update. Finally, at 6:28, I indicated that I had authority.

12.     Responding, now, specifically to allegations contained in the Goldmark declaration and without dropping into an *ad hominum* argument with opposing counsel, to the extent that Messrs. Rheaume and Goldmark have asserted that I intentionally and affirmatively misstated the information regarding the discovery process in the letters he cites as examples, I never did so. Whenever I gave information, I gave it based upon a bona fide belief and that belief was that all of the information that was necessary to answer his discovery requests was available solely in the several bankers' boxes described in this motion. In fact, it was after meeting with

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

Mr. Rheaume in the Play Visions offices, on November 10, 2010, that I turned to Mr. Keron and asked him to find someone who could "get behind" the accounting software and discern what data was available and how to get at it. The information as requested was not available through standard features within the accounting program, but rather, Mr. Lawrence had to write a program that constructed the information from several distinct backend files. It was as a result of my efforts that Mr. Lawrence was retained to reconstruct the specific invoices from the customer history files. Nowhere are the original invoices stored anywhere within the accounting software. These reconstructed invoices were then used to locate the other information that ultimately resulted in the January and February disclosure of over 50,000 documents from the bankers' boxes. When I made the representations Mr. Rheaume disputes, I communicated only what I believed I knew. When that changed, I also communicated the changed information to Mr. Rheaume.

13.     Defendants bring up the issue of active monitoring of the results of Plaintiff's production. The assertions made are simply not true. In several meetings with the client through its three principals, I asked specifically about inventory tracking, generation of invoices and purchase orders, and I was satisfied that Play Visions did not rely upon any database for those capabilities. In fact, in my assessment of the client and its business practices, the explanation that they relied heavily upon paper documents seemed to be well-borne out by the descriptions of workflow through the office. Mr. Chernick described that he regularly relied upon faxes as a principal means of conveying design documents to his Chinese vendors, as Play Visions has no computer assisted drawing programs. To generate a design, Mr. Chernick would draw with a pen or pencil and then fax the design to his vendor for entry into formal drawings. Once the computer generated drawings were created, the vendor would fax those drawings to Mr Chernick for approval. All of this made sense given my observations.

14.     Additionally a part of the monitoring of the Plaintiff included presenting the Plaintiff with Mr. Rheaume's correspondence and discovery requests and explaining each in

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

common English. Each and every time Mr. Rheaume demanded that documents be produced, I again discussed the production need. In short, we did adhere to each of the four *Zubulake* steps, as I did personally: 1) explain, at length what the obligations for "pulling and holding" the information were; 2) communicated regularly and recurrently with the key custodians, Mark Chernick and Caron Coborn their obligations with reference to preserving the documents; 3) learned how plaintiff stored its own information (in bankers' boxes); and 4) ensured that the documents were preserved. They remain there to this date, in the same 360 bankers' boxes.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 7th day of March, 2011 in Seattle, Washington

Mark L. Lorbiecki

DECLARATION OF MARK LORBIECKI- 5

Civil Action No. C09-1769MJP

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### CERTIFICATE OF SERVICE

I certify that on March 7, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

     Warren Rheaume
     John Goldmark
     DAVIS WRIGHT TREMAINE
     1201 Third Avenue, Suite 2200
     Seattle, WA 98101
     warrenrheaume@dwt.com
     johngoldmark@dwt.com

       s/Sarah Gist      

DECLARATION OF MARK LORBIECKI- 5

Civil Action No. C09-1769MJP

PLVN-6-1001P41DEC_MLL

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

**EXHIBIT 1**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

PLAY VISIONS, INC., a           )

Washington corporation,         )

        Plaintiff,           )

        vs.                  )    No. C09-1769-MJP

DOLLAR TREE STORES, INC.,       )

a Virginia corporation, and     )

GREENBRIER INTERNATIONAL,       )

INC., a Delaware corporation,)

        Defendant.           )

--------------------------------------------------------

VIDEOTAPED 30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF

JAY P. KERON

--------------------------------------------------------

9:15 a.m.

February 22, 2011

1201 Third Ave

Seattle, Washington

Margaret Walkky, CCR, RPR, RMR, CRR

Court Reporter, License No. 2540

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                February 22, 2011

Page 2

```
 1                  A P P E A R A N C E S

 2

 3    For Plaintiff:            MARK L. LORBIECKI

 4                              ELLEN M. BIERMAN

 5                              Black Lowe & Graham

 6                              701 Fifth Ave, Ste 4800

 7                              Seattle, Washington 98104

 8                              206-381-3300

 9                              lorbiecki@blacklaw.com

10

11    For Defendants:           WARREN J. RHEAUME

12                              JOHN GOLDMARK

13                              Davis Wright Tremaine

14                              1201 Third Ave, Ste 2200

15                              Seattle, Washington 98101

16                              206-622-3150

17                              warrenrheaume@dwt.com

18

19    Also Present:             Tania Grant,

20                              Videographer

21

22

23

24

25
```

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 12

1          Q.    Did you run any searches or create any
2    electronic reports on any of Play Visions'
3    electronically-stored databases or information?
4          A.    No.
5          Q.    Describe for me, please, Play Visions'
6    document retention, preservation and destruction
7    policies, if any.
8          A.    As far as accounting records, we have one
9    server that runs all of our accounting package.  All
10   the electronic data is stored there.  As far as paper
11   records go, we maintain a filing system downstairs of
12   all of our current customers, and we also maintain a
13   whole lot of banker boxes in our warehouse that have
14   all the old purged files of noncurrent customers along
15   with whatever accounting documents that we have kept.
16         Q.    You've described an overview of some
17   systems for document storage.  What I'm asking is what
18   Play Visions' document retention, preservation and
19   destruction policies are.  What policies are in place
20   that relate to how Play Visions keeps documents and how
21   Play Visions destroys documents?
22         A.    Well, our accounting package maintains
23   history files since the time that we installed that,
24   which was in 1999.  As far as the purchase order
25   system, it deletes purchase orders six months after

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 13

1    they've been completed.  The customer master files

2    maintain invoice copies to the best of my knowledge for

3    about three years.  There's an inventory history file

4    that maintains records of inventory transactions that

5    go back to the inception of the accounting package.

6                 As far as physical records, we tend to

7    purge everything from an accounting perspective after

8    seven years.  Customer records we tend to keep since

9    day one, although I'd say that even customer records

10   past 10 years ago have been destroyed.

11              Q.   The inventory history file, what

12   information is in that file?

13              A.   To the best of my knowledge, all of our

14   receipt of goods and all of the sales invoices along

15   with any sort of inventory that have been written off,

16   disposed of.

17              Q.   That inventory history file goes back to

18   when?

19              A.   The inception of the accounting package,

20   which is about late 1999.

21              Q.   We'll get back to this in greater detail

22   in a moment, but what software package does the

23   inventory history file run on?

24              A.   We're running a package called MAS 200

25   made by Sage.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 16

1          I represent Microsoft from time to time

2    and Microsoft gets sued.  When Microsoft gets sued, I

3    sit down with people at Microsoft and we figure out

4    that Bob and Sally and Bill and Jane are the people who

5    have information that relates to what Microsoft got

6    sued over.  So we then are identifying the people who

7    might have that information.

8          Did a similar process take place at

9    Play Visions?

10        A.   Yes.  Yeah, we had a discussion of who

11   might have relevant data, identified three individuals,

12   probably myself, our CEO, Mark Chernick, and his

13   assistant, Caron Coburn or Caron Lewis.

14        Q.   When did that discussion of who might have

15   relevant data occur?

16        A.   Probably shortly after the lawsuit was

17   filed.

18        Q.   I'm asking a specific question, though.

19   So if you don't know when it occurred, say so, but

20   "probably" qualifies that.

21          When, if you recall --

22        A.   I don't recall.

23        Q.   Okay.  When, if you recall, did the

24   discussion concerning who within Play Visions might

25   have relevant data occur?

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 17

1         A.    I don't know.

2         Q.    Do you have a recollection of such a

3    discussion occurring?

4         A.    No.

5         Q.    So you're just -- strike that.

6               Do you know with whom a discussion to

7    identify the custodians of relevant data may have

8    occurred between?

9         A.    It would have occurred between myself,

10   probably another partner, Web Nelson, and Mark

11   Chernick.

12        Q.    You don't recall it actually taking place?

13        A.    I don't recall a date.  I recall it

14   occurring, discussing after having hired an attorney

15   that all of this relevant data needs to be found, and

16   who would be in possession of, most likely in

17   possession of stuff that would be relevant to this, but

18   don't know when.

19        Q.    Where did that discussion take place?

20        A.    In the office.

21        Q.    Whose office?

22        A.    Probably out on the deck.

23        Q.    But you're not sure?

24        A.    No.

25        Q.    What was done with that information once

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 18

1    those three individuals were identified?

2         A.   What was done with the information?   Can

3    you clarify that?

4         Q.   Well, you have a general belief that a

5    conversation occurred in which three people within

6    Play Visions who would have relevant information were

7    identified, right?

8         A.   Uh-huh.

9         Q.   Yes?

10        A.   Yes.

11        Q.   All right.   Was anything done with that

12   information?

13        A.   No.

14        Q.   Was your counsel involved in identifying

15   those custodians?

16        A.   No.

17        Q.   What, if anything, did your counsel do to

18   become familiar with Play Visions' document retention

19   and destruction policies?

20        A.   To my recollection, nothing.

21        Q.   What, if anything, did your counsel do to

22   become familiar with where and how Play Visions stores

23   its paper and electronic documents?

24        A.   I'm relatively certain there was a

25   discussion between him and Mark and Web, which I was

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 19

1   not involved in.

2           Q.    So you don't have any knowledge on that

3   subject?

4           A.    No, I don't.

5           Q.    I gathered from your prior -- strike that.

6           Give me the three individuals you thought

7   were identified as the people who might have relevant

8   information.

9           A.    Mark Chernick, Caron Coburn also known as

10  Caron Lewis, and myself.

11          Q.    Do you know whether those three people

12  received communications from counsel that instructed

13  them on their duty to preserve relevant information?

14          A.    I have no knowledge of that.

15          Q.    You don't recall receiving one yourself?

16          A.    No.

17          Q.    You've told me a little bit about how

18  paper documents are stored.  Can you give me a little

19  more detail on how Play Visions stores its paper

20  documents that would have relevance to this litigation?

21          A.    They're in bankers boxes on pallets in the

22  warehouse or all the current customer files are kept in

23  files downstairs in the office.

24          Q.    By the "current," do you mean current as

25  of a particular year, or people who were simply current

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 20

1    and active customers of Play Visions?

2            A.    Current and active customers within two

3    years time.  If they haven't done business within two

4    years, we tend to purge those files out of the filing

5    system downstairs.

6            Q.    Who manages that document storage process

7    for the company?

8            A.    Probably primarily customer service and

9    our lead customer service person, who is Liz Marberg.

10           Q.    Can you spell her name, please?

11           A.    Liz Marberg, M-A-R-B-E-R-G.

12           Q.    How does Play Visions organize or index

13   its paper files?

14           A.    For customers, alphabetically.

15           Q.    Those are the active files that are in the

16   office?

17           A.    Correct.

18           Q.    Where do those actually physically reside?

19           A.    There's a file room downstairs.

20           Q.    And do all files go in the file room?

21           A.    Yes.

22           Q.    Is Ms. Marberg responsible for maintaining

23   that file room?

24           A.    No, it's probably been a receptionist,

25   which has varied over the years.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                     February 22, 2011

Page 21

1        Q.   So the receptionist is in charge of the
2   file room?
3        A.   All the files get -- all the paperwork
4   gets put in the file room and the receptionist files
5   that when she has time.
6        Q.   Then how are the bankers boxes that are
7   stored in the warehouse organized?
8        A.   Most of them are by years.  So you've got
9   accounting records that go on a pallet and you'll have
10  two or three years on the pallet.  When the pallet is
11  filled, it's put up on a rack.  The customers that are
12  purged during that time period, those tend to get on
13  the same pallet.
14       Q.   Is there any other organization that
15  applied to the palletized bankers boxes?
16       A.   Nope.  No, sir.
17       Q.   Where does Play Visions store its
18  electronically-stored documents?
19       A.   On the servers in the server room.
20       Q.   You have a server room in the back of the
21  office?
22       A.   Correct.
23       Q.   What kind of structure does your computer
24  network have?
25       A.   That, I don't know.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

                                                        Page 34

1          A.    Gal by the name of Evette Travis.

2          Q.    You don't think that Ms. Travis works from

3    home?

4          A.    No.

5          Q.    Is this statement accurate?  Play Visions

6    relies very little upon computers, tending instead to

7    use fax machines and personal visits as the principal

8    vehicles of commerce.

9          A.    Can you elaborate on that?  I mean --

10         Q.    Does that sound accurate to you?

11         A.    Can you restate the question?

12         Q.    Sure.  Play Visions relies very little on

13   computers, tending instead to use fax machines and

14   personal visits as the principal vehicles of commerce.

15         A.    Probably.

16         Q.    You've described a computer network at

17   Play Visions that has accounting and finance records on

18   it, right?

19         A.    Yes.

20         Q.    That's not done manually by hand on paper,

21   is it?

22         A.    No.

23         Q.    Play Visions makes use of email, doesn't

24   it?

25         A.    Correct.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 35

1          Q.    Would you characterize Play Visions' use

2     of email as a significant component of the way it does

3     business internally and externally?

4          A.    As an overall picture, no.  I would say

5     that it's more done by faxes.  A lot of commerce is

6     done via email.  I don't know.  It's a hard question to

7     answer.

8          Q.    How many fax machines are in Play Visions'

9     offices?

10         A.    Two.

11         Q.    What kind of fax machines are they?

12         A.    One is a Mita.  The other one, I don't

13    know.

14         Q.    Does Play Visions maintain any fax logs?

15         A.    No.

16         Q.    Neither inbound or outbound?

17         A.    No.

18         Q.    What -- strike that.

19              When did Play Visions first identify the

20    types and locations of documents relevant to this suit?

21         A.    Probably shortly after it was filed.

22         Q.    I'm asking for your recollection, not your

23    speculation.

24         A.    I don't know.

25              (Exhibit-2 marked.)

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 36

1          Q.   Exhibit-2 I'll represent to you is
2     Play Visions' initial disclosures dated June 29, 2010.
3     Have you ever seen this document before today?
4          A.   Not that, to my recollection, no.
5          Q.   Turn to page 2, if you would.  There's a
6     list of people who are identified as likely to have
7     discoverable information that Play Visions may use to
8     support its claims.  Do you see that list?
9          A.   Uh-huh, yes.
10         Q.   Do you know how that list of people came
11    into being?
12         A.   I do not.
13         Q.   If you turn to page 6, there's a list of
14    categories of information that Play Visions has in its
15    possession, custody or control that may be used to
16    support its claims or defenses, and carrying on to page
17    7, there's a list of categories.  Do you know how that
18    list of categories came into being?
19         A.   Are you talking about relevant documents
20    and things?
21         Q.   Yes.
22         A.   No, I do not.
23         Q.   As of the date of this document, June 29,
24    2010, at least as of that date, Play Visions knew that
25    the relevant documents included documents related to

Seattle Deposition Reporters, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 37

1    Play Visions' development, manufacture and sales of its

2    products, documents regarding the patents, trademarks

3    and copyright that's involved here, and the other

4    things that are on page 7 in the seven categories.

5           My question to you is:  With respect to

6    the identified documents on page 7 of Exhibit-2, what

7    did Play Visions do to locate relevant documents and

8    when did it do it?

9           A.   I believe that there would have been a

10   search through our boxes and boxes of files primarily

11   out of the warehouse looking at the list for anything

12   relevant to this suit.

13          Q.   Did that happen?

14          A.   I know there was some searching occurred.

15          Q.   When did the first of any such search

16   occur?

17          A.   Sometime last summer, probably June or

18   July.

19          Q.   Do you know?

20          A.   Personally I was not involved in it, so

21   no.

22          Q.   What have you done to inform yourself as

23   to when the first search for relevant documents

24   occurred?

25          A.   Nothing.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 38

1        Q.    Are you speculating then when you

2    testified that it probably happened last summer?

3        A.    I've had discussions with my partner, Mark

4    Chernick, who told me that he and Caron had both gone

5    and searched files.

6        Q.    When?

7        A.    I repeat, last summer.

8        Q.    When did you have that conversation with

9    Mr. Chernick?

10       A.    Probably December to the best of my

11   recollection.

12       Q.    December of 2010?

13       A.    December of 2010.

14       Q.    In what context?  Why were you having that

15   conversation?

16       A.    Probably during a discussion of the

17   lawsuit about the discovery issues.

18       Q.    Do you have a specific recollection of the

19   conversation with Mr. Chernick about searches that he

20   did on paper files in the summer?

21       A.    To give you a date, no.  The recollection

22   of the conversation, yes.

23       Q.    Do you have an understanding as to what

24   Mr. Chernick found in whatever search he did on the

25   paper files at Play Visions in the summer of 2010?

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 39

1          A.    An understanding of what he found?  No.

2          Q.    Do you know if he found any relevant

3     documents in whatever he searches he did in the summer

4     of 2010 on Play Visions' paper files?

5          A.    Will you repeat the question?

6          MR. RHEAUME:  Margaret?

7          (Record read as requested.)

8          A.    I believe he did and forwarded the

9     information that he had found to our attorney.

10         Q.    And upon what is that belief based?

11         A.    Simply a conversation with him.

12         Q.    Is this a conversation that occurred in

13    December?

14         A.    Yes.

15         Q.    What documents were forwarded to

16    Play Visions' counsel as a result of Mr. Chernick's

17    searches last summer?

18         A.    That, I don't know.

19         Q.    Mr. Chernick didn't tell you what he

20    found?

21         A.    No.

22         Q.    You didn't ask?

23         A.    No.

24         Q.    Do you believe the documents were

25    forwarded to Play Visions' counsel in the summer of

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 40

1    2010?

2          A.   Well, I have to assume because he told me

3    what he found was forwarded, so yes.

4          Q.   But you don't know what that was?

5          A.   No.

6          Q.   And you don't have any other basis for

7    knowledge about what was forwarded?

8          A.   No.

9          Q.   Strike that.

10         You don't have any knowledge about what

11   was located, if anything, in searches done in the

12   summer of 2010?

13         A.   No.

14         Q.   Do you know what Mr. Chernick or anyone

15   else in the summer of 2010 reviewed as part of this

16   document search?

17         A.   No.

18         Q.   Do you know whether the boxes of documents

19   that are stored in the warehouse were reviewed in the

20   summer of 2010?

21         A.   Per the conversation with Mr. Chernick,

22   yes.

23         Q.   All of them?

24         A.   That, I don't know.

25         Q.   Approximately how many bankers boxes are

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 41

1    kept in storage in the warehouse at Play Visions?

2          A.   Oh, I would guess probably 300 or more.

3          Q.   Did you see any of those boxes being

4    reviewed in the summer of 2010?

5          A.   Personally, no.

6          Q.   Isn't that something that you would notice

7    as you went about your daily activities at

8    Play Visions?

9          A.   No.

10         Q.   Why not?

11         A.   Because they're all in the warehouse.

12         Q.   And you don't go in the warehouse?

13         A.   Not very often.

14         Q.   Is it your understanding that Mr. Chernick

15   personally searched for relevant documents in the

16   summer of 2010?

17         A.   I think the primary search was done by his

18   assistant, Caron Coburn, it's my understanding.

19         Q.   Have you discussed the question of

20   searching for relevant documents with her?

21         A.   No.

22         Q.   Do you have an understanding as to what

23   document stores were searched in the summer of 2010?

24         A.   My understanding was all the old files

25   relevant to the products in question in this lawsuit.

Seattle Deposition Reporters, LLC
www.seadep.com   (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 42

1          Q.    Which would have been in the bankers boxes

2     in the warehouse?

3          A.    Correct.

4          Q.    Was Mr. Chernick any more specific as to

5     when these searches were conducted in his conversation

6     with you in December of 2010?

7          A.    Not to my recollection, no.

8          Q.    Who participated in that discussion?

9          A.    Just Mark and I.

10         Q.    Where did it occur?

11         A.    On the deck of our office.

12         Q.    You're fairly certain it was in December?

13         A.    Fairly, yes.

14         Q.    How did Play Visions become aware of

15    Dollar Tree's first discovery requests, which were

16    served on counsel on June 30, 2010?

17         A.    How were we made aware?

18         Q.    Yes.

19         A.    Of the discovery requests?

20         Q.    The first discovery requests.

21         A.    The first discovery requests?

22         Q.    Yes.

23         A.    To the best of my knowledge, by a copy of

24    those requests forwarded to our office.

25         Q.    Was it forwarded to your attention?

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 43

1        A.    No.

2        Q.    To whose attention was it forwarded?

3        A.    Mark's.

4        Q.    Mark, Mark Chernick?

5        A.    Mark Chernick.

6        Q.    Did that occur on or around June 30, 2010?

7        A.    I believe so.

8        Q.    What --

9        A.    But since it was not sent to me, I don't

10   know that for certain.

11        Q.    What is the basis for your belief?

12        A.    Probably a discussion between Mark and I

13   as to the fact that there have been discovery requests

14   sent to us from our, by our attorney.

15        Q.    You say "probably."  Are you speculating?

16        A.    I don't recall.

17        Q.    Describe each step that Play Visions took

18   to search for and identify documents responsive to

19   Dollar Tree's first discovery requests served June 30,

20   2010.

21        A.    To the best of my knowledge primarily

22   Caron Coburn went to search for anything relevant to

23   the creation or of the items, any records referencing

24   development of those items.

25        Q.    What items are those?

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 44

1          A.   The various ones covered under the
2     lawsuit.
3          Q.   What items are those?
4          A.   Urchin balls, centipedes, the UFO fliers.
5     Those are the ones that I know of.  I am not privy --
6     or I shouldn't say that.  I'm not knowledgable of what
7     all items were covered under the patents.
8          Q.   So when you use the term "items," you're
9     referring to products that practice the patents?
10          A.   If I'm understanding your question
11     correctly, yes.
12          Q.   Who instructed Ms. Coburn to make the
13     searches you just described?
14          A.   I'm sure it was Mark.
15          Q.   How are you sure that it was Mark?
16          A.   Because he would be the one that the
17     discovery request was sent to.
18          Q.   You're referring to Mark Chernick?
19          A.   Correct.
20          Q.   How do you know that Mr. Chernick
21     instructed Ms. Coburn to make these searches?
22          A.    I don't know that for a fact.  I know that
23     he was the one that was given the discovery requests,
24     so by default, he's the only one that would have
25     instructed her to make the search.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 45

1       Q.    So you're speculating that Mr. Chernick

2   instructed Ms. Coburn to make searches for anything?

3       A.    I'm certain that Mark told me that he

4   asked Caron to look for these things so --

5       Q.    When did he tell you that?

6       A.    I couldn't tell you.

7       Q.    Then how can you be certain?

8       A.    Well, sometime in the summer, I can't give

9   you a specific date or even a specific month, but at

10  some point in time after the discovery requests were

11  sent to us, he told Caron and he told me that he told

12  Caron to go look and see what she could do to find

13  whatever is relevant.

14      Q.    Do you know whether she did that or not?

15      A.    Yes, she did.

16      Q.    How do you know that?

17      A.    Because she told me so.

18      Q.    When did she tell you that?

19      A.    Sometime after her initial search in the

20  summer.

21      Q.    What did she tell you she did?

22      A.    She had gone up and gone through the boxes

23  of all of her communications.  She didn't go through

24  the boxes of invoices that have nothing to do with the

25  creation of the products.  There are pallets of old

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 46

1    records that are with factories we have worked with on

2    various products, and there are pallets of accounting

3    records and customer records.

4           Q.    Did Ms. Coburn tell you what she was

5    instructed to search for?

6           A.    No.

7           Q.    Do you know what she searched for?

8           A.    No.

9           Q.    Did Mr. Chernick tell you what he

10   instructed her to search for?

11          A.    Anything relevant to our design or

12   creation of the products.

13          Q.    That's what he told you?

14          A.    Yes.

15          Q.    And he told you that when?

16          A.    Again, sometime in the summer.

17          Q.    Did anybody else search for or identify

18   responsive documents?

19          A.    To my knowledge, no.

20          Q.    Was any search performed on

21   electronically-stored information to locate information

22   that was responsive to Dollar Tree's first discovery

23   requests?

24          A.    Can you repeat the question?

25          Q.    Sure.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 47

1              (Record read as requested.)

2         A.    I don't know.

3         Q.    You're not aware of any?

4         A.    I'm not aware of any.

5         Q.    As CFO of the company, would you be aware

6    of such searches if they were performed?

7         A.    Probably not.

8         Q.    Who would be?

9         A.    Probably Mark.

10        Q.    But in any event, you're aware of no

11   attempt to locate and identify responsive electronic

12   documents in response to Dollar Tree's first discovery

13   requests, right?

14        A.    Being that we don't archive any of those

15   kind of documents, there wouldn't be anything available

16   to search.

17        Q.    My question is:  You're not aware of any

18   search being performed to locate --

19        A.    Correct, I'm not aware of any search.

20        Q.    We kind of walked on each other there.

21              You're not aware of any search on

22   electronically-stored information at Play Visions to

23   locate information responsive to Dollar Tree's first

24   discovery requests, right?

25        A.    Not for the first ones, no, I'm not aware

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 51

1          Q.    Was any search of the database at
2    Play Visions performed to locate documents that would
3    evidence first sale prior to, to use your phrase,
4    October or November of 2010?
5          A.    To the best of my knowledge, no.
6          Q.    You understand Play Visions' accounting
7    and business practices pretty well, don't you?
8          A.    I would say yes.
9          Q.    What categories of documents in
10   Play Visions' system would indicate first manufacture,
11   use, sale, offer for sale?
12         A.    Probably the first invoice of goods
13   received.
14         Q.    Wouldn't there be documents that precede
15   the first invoice of goods received indicating an offer
16   for sale or purchase?
17         A.    Not in the system, no.
18         Q.    Because the purchase orders have been
19   purged?
20         A.    That's how our accounting package works.
21         Q.    Would there be a log of the receipt of a
22   purchase order from -- strike that.
23               Would there be a log of a purchase order
24   issued from Play Visions to a manufacturer for a
25   particular product?

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 55

1   to --

2          A.    Yes.

3          Q.    -- illustrate a product?

4          A.    Yes.

5          Q.    What, if any, effort was made to locate

6   quotes from manufacturers to Play Visions for products

7   that practice the patent to respond to Dollar Tree's

8   first discovery requests?

9          A.    Again, I believe it was Caron Coburn

10  searching records upstairs.

11         Q.    Paper records?

12         A.    Paper records.

13         Q.    To your knowledge, no electronic search

14  was done, right?

15         A.    There would be no electronic records, so

16  no, there was no electronic search.

17         Q.    Well, there would be electronic records in

18  some instances, wouldn't there, because there would be

19  possibly email that relate to a quote from a

20  manufacturer or the purchase order going to the

21  manufacturer; isn't that true?

22         A.    But we don't archive emails, so there

23  would be no records.

24         Q.    Do you know whether the local hard drives

25  of anyone was searched to determine whether such email

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 56

1   was stored locally?

2          A.   Again, there wouldn't be.  There's a limit

3   on size of what your email account will hold and

4   everyone purged their email system.

5          Q.   But in any event, no search was made,

6   right?

7          A.   To my knowledge, no.

8               Can I get some more water?

9               MR. RHEAUME:  Sure.  Why won't we take a

10  break for five minutes.

11              THE VIDEOGRAPHER:  We're now going off the

12  record, the time is 10:31 a.m.

13              (Brief recess.)

14              THE VIDEOGRAPHER:  We are now back on the

15  record.  The time is 10:46 a.m.

16         Q.   Mr. Keron, what did Play Visions do to

17  search for and identify documents that relate to the

18  creation of the work that is covered by the copyright

19  that's asserted in this litigation in response to

20  Dollar Tree's first discovery requests?

21         A.   Again, to the best of my knowledge, Mark

22  asked Caron to go search the boxes of files and records

23  that we have on premise.

24         Q.   What's your basis for that testimony?

25         A.   Mark telling me at some point in time, and

Page 63

1    under oath, "Currently, Play Visions does not have

2    records of the first publication nor of the offer for

3    sale of any of the products in question, but would

4    rely, to answer this question, upon the catalogs and

5    purchase orders produced in response to defendants'

6    request for production of documents."

7                   Do you see that?

8         A.    Yes.

9         Q.    Do you know how Play Visions determined

10   that that answer was supposedly accurate?

11        A.    I do not.

12        Q.    Based upon your understanding of

13   Play Visions' records, the certification that

14   Play Visions didn't have any records of the first offer

15   for sale of the relevant products was false; isn't that

16   true?

17        A.    Can you restate -- ask that question

18   again?

19                   (Record read as requested.)

20        A.    This statement was made when, this

21   answer?

22        Q.    The interrogatory answers were presented

23   to Play Visions on July 7, 2010.

24                   MR. LORBIECKI:  You mean, to Dollar Tree.

25                   MR. RHEAUME:  To us.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

Page 64

1              MR. LORBIECKI:   Okay.

2        A.   That time, that question being answered by

3   Mark Chernick, I would say his statement was true.

4        Q.   No search had been made through the

5   electronic records to locate evidence of first sale of

6   products that practiced the asserted patents; isn't

7   that right?

8        A.   To his knowledge, there was no records

9   available for this search.

10       Q.   He didn't look, did he?

11       A.   I don't know.

12       Q.   You're the 30(b)(6) deponent.  You have to

13   know.

14       A.   Well, I don't know if he looked or not.

15       Q.   You've testified that to your knowledge no

16   electronic search was done to respond to Dollar Tree's

17   first discovery requests, right?

18       A.   To the best of my knowledge, no, there was

19   not.

20       Q.   And you also testified to that there are

21   documents within Play Visions' accounting systems that

22   would evidence, such as invoices relating to

23   Play Visions' acquisition of products that practiced

24   the asserted patents, right?

25       A.   Correct.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 65

1      Q.   So the statement that Play Visions does

2   not have records when it was made on July 7, 2010 was

3   false, wasn't it?

4      A.   To Mr. Chernick's knowledge, no, it was

5   not.

6      Q.   Knowing what you know now, was that

7   statement made on July 7th false?

8      A.   It was inaccurate.

9      Q.   Is there a difference between false and

10  inaccurate, in your mind?

11     A.   Yes.

12     Q.   What's the difference?

13     A.   The difference is that to his knowledge,

14  there were no records thereof.  The fact that there

15  were does not mean that he knew about them.

16     Q.   It just means that he didn't look, right?

17     A.   He wouldn't know where to look.

18     Q.   He wouldn't know that the accounting

19  system --

20     A.   He wouldn't know how to search the

21  database.

22     Q.   But you would?

23     A.   Yeah.

24     Q.   Did he ask you to search the database to

25  find the records of evidence of first sale?

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 66

1          A.    No.  I explained to him that to my

2    knowledge in our customer master, you are not able to

3    find that data.  And at that time, that was my

4    knowledge.

5          Q.    But no search was ever performed on that

6    data, is that correct, to respond to Dollar Tree's

7    first discovery requests?

8          A.    I looked to see if we could come up with

9    records of when stuff was first sold.  At that time, I

10   could not determine how to find that.

11         Q.    When did you make that search?

12         A.    Probably shortly after this was given to

13   us.

14         Q.    Do you recall making the search of

15   Play Visions' accounting system?

16         A.    I recall looking at customer masters

17   trying to determine how far back we could look at when

18   we sold this product.  Yes, I do.

19         Q.    When did that occur?

20         A.    Probably July.

21         Q.    After Exhibit-4?

22         A.    Yes.

23         Q.    What's a customer master?

24         A.    Customer master is the file that holds all

25   the customer history.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 67

1      Q.   And does it exist within the MAS 200
2  system?
3      A.   Correct.
4      Q.   Is it a database file?
5      A.   My understanding, yes.
6      Q.   Are there invoice records that would
7  indicate first sale within the MAS 200 system?
8      A.   In the customer master, no.
9      Q.   I didn't ask you to limit it to the
10 customer master.
11     A.   All right.  Then yes, there are.
12     Q.   Did you look there?
13     A.   I didn't know of its existence.
14     Q.   Did you later learn of the existence of
15 invoice data in the MAS 200 system?
16     A.   Yes.
17     Q.   When did that piece of knowledge come to
18 you?
19     A.   January of 2010.
20     Q.   And how did you learn it?
21     A.   From my IT guy.
22     Q.   Mr. Lawrence?
23     A.   Uh-huh, correct.
24     Q.   Was Mr. Lawrence requested to be of
25 assistance in the creation of the responses to Dollar

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 68

1    Tree's first discovery requests?

2          A.    Not until sometime in the fall.

3          Q.    The fall of 2010?

4          A.    '10.

5          Q.    When did Play Visions become aware of the

6    fact that the answer to interrogatory No. 3 was

7    inaccurate?

8          A.    The best of my knowledge, January.

9          Q.    Of 2010?

10         A.    2011.

11         Q.    January 2011, I'm sorry.

12               Has Play Visions ever supplemented or

13   amended its response to interrogatory No. 3?

14         A.    I don't know.

15         Q.    Are you aware of any supplementation or

16   amendment?

17         A.    No, I'm not.  How would you define

18   supplement or amendment?

19         Q.    Changing an incorrect answer to be correct

20   by supplementation or amendment.

21         A.    That, I don't know of.

22         Q.    Dollar Tree posed its second discovery

23   requests on September 21st, 2010.  Did you -- strike

24   that.  Did Play Visions receive a copy of Dollar Tree's

25   second document requests and interrogatories?

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                     February 22, 2011

Page 72

1        Q.    When have you seen request 48 before?

2        A.    Early January 2011.

3        Q.    That's the first time you saw request 48?

4        A.    To the best of my recollection, yes.

5        Q.    Request for production number 48 asks for

6    the production of documents concerning Play Visions'

7    importation, distribution or sale of any product

8    covered by or made in accordance with one or more of

9    claims of the asserted patents, right?

10       A.    Yes.

11       Q.    And it specifically calls for bills of

12   laid, quote sheets, packing lists, invoices, purchase

13   orders --

14       A.    Yes.

15       Q.    -- as examples of those documents.

16             What did Play Visions do to locate

17   documents responsive to request for production 48?

18       A.    I know that all of the pallets of boxes,

19   of bankers boxes were pulled from the shelves and

20   offered up for Dollar Tree to come in and search.

21       Q.    That occurred in November, didn't it?

22   I'll represent to you that that occurred on

23   November 10, 2010.

24       A.    Okay.

25       Q.    All right.  The responses that are

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 73

1   Exhibit-5 are dated October 21st, 2010.  So my question

2   is:  Prior to the date of the responses, what had

3   Play Visions done to locate and identify documents

4   responsive to request 48?

5            A.   To my knowledge, those pallets full of

6   banker boxes were pulled and examined to see if they

7   contained relevant documents.

8            Q.   By whom?

9            A.   That, I don't know.  Someone in our office

10  and I believe it might have been Caron, but I don't

11  know for certain.

12           Q.   When did that occur?

13           A.   That, I don't know either.

14           Q.   What's the basis for your testimony then?

15           A.   I was told that they were searched by

16  Mark.  I was told that the documents were pulled out.

17           Q.   When did Mr. Chernick -- you said Mark?

18           A.   Mark, Mr. Chernick.

19           Q.   Mark Chernick?

20           A.   Correct.

21           Q.   You have two Marks employed here?

22           A.   Correct.

23           Q.   When did Mr. Chernick advise you that the

24  approximately 300 or more bankers boxes were reviewed

25  to locate relevant documents, locate responsive

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 74

1    documents?

2              A.    October.

3              Q.    He told you that in October?

4              A.    I believe so.

5              Q.    In a conversation?

6              A.    Yes.

7              Q.    What did he tell you about that review?

8              A.    No details other than that to the best of

9    my recollection, they had pulled the pallets to see

10   where these documents that might have relevancy would

11   be.

12             Q.    Who conducted the review?

13             A.    I believe Caron and possibly himself.

14             Q.    What's your basis for that testimony?

15             A.    Discussion with Mark.

16             Q.    And that discussion occurred in October of

17   2010?

18             A.    I believe so.

19             Q.    Who pulled the pallets out of the high

20   steel?

21             A.    I'm sure one of the warehouse guys.

22             Q.    Do you know or are you speculating?

23             A.    I'm speculating.

24             Q.    Do you know whether this review took

25   place?

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 86

1    requests?
2           A.    Probably by a conversation with
3    Mr. Chernick and I.
4           Q.    Do you recall?
5           A.    No.
6           Q.    When you say "probably" --
7           A.    I do not recall.
8           Q.    If you don't recall something, please
9    don't speculate.
10          A.    Okay.
11          Q.    If you don't recall something, say you
12   don't recall.
13          A.    I do recall a conversation with
14   Mr. Chernick in reference to the need to produce
15   records.  When that conversation occurred, I can't tell
16   you.  I don't have a recollection of that.
17          Q.    Did it occur shortly before your
18   conversation with Mr. Lawrence that created Exhibit-8?
19          A.    Of course.
20          Q.    So sometime in October?
21          A.    Or early November.
22          Q.    What did you instruct Mr. Lawrence to do?
23          A.    To see if he could come up with a report
24   from the database that would identify all of the sales
25   of the items in question.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 87

1       Q.    That's what you told him to do?

2       A.    Yes.

3       Q.    Did he do so?

4       A.    There's the example of it, yes.

5       Q.    Why didn't Play Visions produce the actual

6  invoices?

7       A.    We actually did give you access to all of

8  the actual invoices in the form of 36 bankers boxes.

9       Q.    360?

10      A.    360.

11      Q.    Those invoices actually existed in

12  electronic form in Play Visions' accounting package,

13  didn't they?

14      A.    Well, apparently.

15      Q.    So my question again is:  Why didn't

16  Play Visions produce the actual invoices on November

17  22nd in electronic format?

18      A.    Because we didn't realize that -- we were

19  not aware of their existence.

20      Q.    When did you -- strike that.

21            When did Play Visions become aware of

22  electronically-stored invoices responsive to Dollar

23  Tree's first and second requests for production of

24  documents?

25      A.    Probably early January 2011.

Seattle Deposition Reporters, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 88

1          Q.    How did Play Visions become aware of the

2    existence of invoices responsive to Play Visions' first

3    and second requests for production of documents?

4          A.    By a discussion between me and

5    Mr. Lawrence.

6          Q.    Where did that discussion take place?

7          A.    Over the phone.

8          Q.    Describe it.

9          A.    He informed me that he had produced a

10   spreadsheet and that Dollar Tree had felt it was not

11   sufficient production, and I asked him well, to

12   describe how he was able to obtain this and if there

13   was a possibility of producing from an electronic

14   database copies of invoices, at which point in time he

15   told me yes, we could produce them in a PDF format.

16         Q.    That was the first time that Play Visions

17   became aware of the existence of the invoices in its

18   own files?

19         A.    Correct.

20         Q.    Why hasn't Play Visions produced the

21   database that Mr. Lawrence makes reference to?

22         A.    My understanding was that he has, that we

23   have.

24         Q.    What's your basis for that understanding?

25         A.    I was told that this database was -- and

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 101

1    particular vendor.  Let's just use Everite as an
2    example.  How is the purchase order transmitted from
3    Play Visions to Everite?
4            A.    To my knowledge, typically a paper copy of
5    a purchase order is produced and then in turn scanned
6    and emailed to Everite or to whatever vendor.
7            Q.    The purchase order is produced how?  Is
8    there a subroutine in the accounting package that
9    produces purchase orders?
10           A.    Yes.
11           Q.    That's produced by the MAS 200 system?
12           A.    Correct.
13           Q.    So the paper copy of the purchase order
14   that's produced electronically by the MAS 200 system is
15   scanned and then that scanned file is transmitted to
16   the vendor via email; is that correct?
17           A.    Correct.
18           Q.    Is the paper purchase order that is then
19   scanned retained?
20           A.    Until at some point in time there's a
21   sales confirmation from the vendor, yes.  After that,
22   most likely shredded.
23           Q.    Is there any uniform practice or does it
24   depend on the individual?
25           A.    I'd say it probably depends on the

Seattle Deposition Reporters, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 102

1   individual, but like I said, then they're shredded.

2   Once we have a sales confirmation, there's no need to

3   have a paper copy of the purchase order.

4           Q.    Who made that decision?

5           A.    Probably our purchasing people.

6           Q.    Do you know?

7           A.    No, I don't.

8           Q.    Has any effort been made to locate

9   purchase orders that weren't destroyed after the sales

10  confirmation was received by Play Visions?

11          A.    In the process of searching all of the

12  inbound invoices relative to the products involved in

13  this, yes, and there are none that we could find.

14          Q.    Not a one?

15          A.    I won't say not a one.  I know that there

16  was one particular invoice that we couldn't find in our

17  accounting records, but Evette has been able to find

18  one and I think I remember seeing a copy of a purchase

19  order with it.

20          Q.    On January 20th, 2011 Play Visions

21  produced something over 33,000 invoices of

22  Play Visions' sales of products that practice the

23  patents.  Some, but not all of them.  Are you familiar

24  with that document production?

25          A.    Yes.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 105

1   understand it; is that correct?

2           A.   Yes.

3           Q.   He's the maintaining entity of that

4   system?

5           A.   He's our IT consultant for the accounting

6   package.  I won't say he maintains it.  It maintains

7   itself.

8           Q.   But it doesn't know to run queries against

9   itself, does it?

10          A.   No, it doesn't.

11          Q.   So other than Play Visions' failure to ask

12  Mr. Lawrence to run the search, there was no reason

13  that these 33,000 invoices couldn't have been located

14  prior to July 7, 2010?

15          A.   I would say that's accurate, yes.

16          Q.   Did plaintiff's counsel assist

17  Play Visions in searching for or identifying the

18  documents that were produced on January 20th?

19          A.   No.

20          Q.   When did Play Visions first identify any

21  of these 33,000 invoices as responsive?

22          A.   Define "responsive."

23          Q.   Well, they were produced to us.  They were

24  responsive to a request for production.

25          A.   Oh.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 106

1          Q.    That's what I mean by responsive.

2          A.    So the question would be then?

3          Q.    When did Play Visions first identify that

4    any of these 33,000 invoices were responsive to Dollar

5    Tree's first request for production of documents?

6          A.    Early January.

7          Q.    Shortly before they were produced?

8          A.    Correct.

9          Q.    Did the January 20th, 2011 production

10   contain all Play Visions invoices for products that

11   practiced the patents?

12         A.    They contain all the products that we

13   requested Mr. Lawrence to pull a search on.

14         Q.    What determined what products Mr. Lawrence

15   was requested to pull a search on?

16         A.    A list I obtained I believe from

17   Mr. Lorbiecki.

18         Q.    And how did you obtain that list?

19         A.    By email?

20         MR. LORBIECKI:  I'm not allowed to

21   testify.

22         A.    It might have been in paper form.  I know

23   I transmitted it on to Tom and asked him to query the

24   database for any outbound invoices that contained any

25   of the items in said list.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 107

1        Q.    What was your understanding the nature of
2   the list you used to instruct Mr. Lawrence?
3        A.    That these were items that were involved
4   in a lawsuit and we needed to produce all the invoices
5   that from day one that had those items on them.
6        Q.    How many items were there on the list that
7   you gave to Mr. Lawrence?
8        A.    To my recollection, 43.
9        Q.    There have been approximately 75
10  Play Visions products that have been identified by
11  Play Visions as products that practice the patent.  Why
12  didn't you use that list that appeared in your
13  interrogatory answers to instruct Mr. Lawrence?
14       A.    Because at the time I didn't have it.
15       Q.    And that January 20th production of
16  documents doesn't contain any invoices that relate to
17  Play Visions' purchase of the products that practice
18  the patents, right?
19       A.    Correct.
20       Q.    It's only Play Visions sales?
21       A.    Correct.
22       Q.    Play Visions then made another production
23  of a little over 2,000 invoices on January 25th, 2011.
24  Are you familiar with that production?
25       A.    If those are the invoices of inbound

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 108

1   purchases of products, yes.

2           Q.   Were those documents stored in paper or

3   electronic format?

4           A.   Paper.

5           Q.   Were those -- strike that.

6                Where were those documents located?

7           A.   In various boxes in the warehouse.

8           Q.   In the 360 bankers boxes that we've been

9   referring to?

10          A.   Correct.

11          Q.   When were they located?

12          A.   January 20th, 21st.

13          Q.   Shortly before they were produced?

14          A.   Correct.

15          Q.   Why were not those inbound purchase

16  invoices located prior to, shortly before January 25th,

17  2011 production?

18          A.   They were made available for your visit as

19  part of the boxes.

20          Q.   The boxes were made available?

21          A.   Correct.

22          Q.   These invoices were not located?

23          A.   They were stored as we store them and then

24  when I was made aware of the fact we needed to produce

25  inbound invoices, we went and again Mr. Lawrence pulled

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 109

1   a list of all invoices that contained the items in

2   question and then we physically pulled them, Xeroxed

3   them, scanned them and copied them to a thumb drive.

4        Q.   So the inbound invoices representing

5   evidence of Play Visions' purchase of products that

6   practice the patents had not occurred until shortly

7   before their production on January 25, 2011, right?

8        A.   Correct.

9        Q.   How did Play Visions search for and

10  identify the documents that it produced on January

11  25th?

12       A.   By a list produced by Mr. Lawrence from

13  the inventory history file which in turn identified all

14  invoices that had any of the products in question on

15  them.

16       Q.   Was Mr. Lawrence using the same list you

17  provided him earlier to determine which products were

18  relevant?

19       A.   Yes.

20       Q.   It had 43 items on it?

21       A.   Yes.

22       Q.   Did plaintiff's counsel assist

23  Play Visions in searching for or identifying the

24  documents that it produced on January 25th, 2011?

25       A.   No.

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

Page 124

1              S I G N A T U R E

2

3

4

5           I declare under penalty of perjury under

6      the laws of the State of Washington that I have read

7      my within deposition, and the same is true and

8      accurate, save and except for changes and/or

9      corrections, if any, as indicated by me on the CHANGE

10     SHEET flyleaf page hereof.

11              Signed in...............WA on the......day

12     of................., 2011.

13

14

15

16                       ..........................

17                       JAY P. KERON

18                       Taken: February 22, 2011

19

20

21

22

23

24     Reporter: Margaret Walkky

25

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

30(b)(6) - Jay P. Keron                    February 22, 2011

Page 125

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON      ) ss.

3    COUNTY OF KING           )

4              I, the undersigned Registered Merit

5    Reporter and and Washington Certified Court Reporter do

6    hereby certify that the foregoing deposition upon oral

7    examination of JAY P. KERON was taken before me on

8    February 22, 2011 and transcribed under my direction;

9              That the witness was duly sworn by me

10   pursuant to RCW 5.28.010 to testify truthfully; that

11   the transcript of the deposition is a full, true, and

12   correct transcript to the best of my ability; that I am

13   neither attorney for, nor a relative or employee of,

14   any of the parties to the action or any attorney or

15   counsel employed by the parties hereto, nor financially

16   interested in its outcome.

17             IN WITNESS WHEREOF, I have hereunto set my

18   hand and seal this date: February 23, 2011.

19

20

21

22        ....................................

23        Margaret Walkky, Registered Merit Reporter,

24        Certified Court Reporter No. 2540.

25        License expires July 18, 2011

b95862cf-bec4-4bd7-88c8-dfb61807a1d3

**EXHIBIT 2**

The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| PLAY VISIONS, INC., a Washington corporation<br><br>     Plaintiff,<br><br>  v.<br><br>DOLLAR TREE STORES, INC., a Virginia corporation and GREENBRIER INTERNATIONAL, INC., a Delaware Corporation,<br><br>     Defendant. | Civil Action No. C09-1769MJP<br><br>PLAY VISIONS, INC.'S RESPONSES TO DEFENDANTS' SECOND REQUESTS FOR PRODUCTION (Nos. 48-49) |

Pursuant to Fed. R. Civ. P. 26 and 34, Plaintiff Play Visions Inc. ("Play Visions") responds to Defendants' second set of requests for production as follows:

**I.  GENERAL OBJECTIONS AND RESPONSES**

1.  Play Visions objects to these requests to the extent that they seek to discover information of a confidential, trade secret or proprietary nature. Play Visions will respond to these requests pursuant to an appropriate protective order issued by the Court.

2.  Play Visions objects to these requests to the extent that they seek information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege, or are otherwise immune from discovery.

PLAY VISIONS, INC.'S RESPONSES TO
DEFENDANTS' SECOND REQUESTS FOR
PRODUCTION - 1

Civil Action No. C09-1769MJP

PLVN-6-1001P22RRFP02

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

3.      Play Visions objects to these requests to the extent that they impose upon Play Visions an undue burden and expense, seek information not reasonably calculated to lead to the discovery of admissible evidence, or are not relevant to the claims or defenses involved in the pending action.

4.      Play Visions objects to the requests to the extent that they seek to impose obligations greater than those required by Fed. R. Civ. P. 26. Play Visions also objects to the extent that the requests seek to impose obligations that are unduly burdensome where information sought is obtainable from some other source that is more convenient, less burdensome, and less expensive.

5.      Play Visions objects to the use throughout these requests of words and phrases that are vague, ambiguous, not sufficiently definite, or susceptible to varying interpretations. Play Visions' responses to the requests are based on its understanding of such words and phrases.

6.      Play Visions' response to any of these requests shall not be construed as constituting a waiver of any general or specific objections whether or not such objections are reiterated in response to a given request. Play Visions reserves the right to assert any such objection in any response given.

7.      Play Visions objects to Defendants' definition of "Play Visions," "Plaintiff," "you," or "your" set forth in the definition section as too broad and encompassing in the inclusion of other persons or entities, including independent contractors, thereby exceeding the scope of permissible discovery under Fed. R. Civ. P. 26(b)(1). Play Visions will limit its responses concerning the terms "Play Visions," "Plaintiff," "you," or "your" to itself only.

8.      These General Objections are incorporated into Play Visions' response to each request below whether or not expressly repeated.

PLAY VISIONS, INC.'S RESPONSES TO
DEFENDANTS' SECOND REQUESTS FOR
PRODUCTION - 2

Civil Action No. C09-1769MJP

PLVN-6-1001P22RRFP02

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

## II.    REQUEST FOR PRODUCTION

**REQUEST NO. 48**

Please produce all Documents Concerning Plaintiff's importation, distribution, or sale of any product covered by or made in accordance with one or more claims of the Asserted Patents, including without limitation all bills of lading, quote sheets, packing lists, invoices and purchase orders.

**RESPONSE**:

Plaintiff will, subject to its objections, provide for inspection and photocopying, pursuant to Rule 34, all relevant records which the Plaintiff certifies are kept only and solely in paper format in a storage room. Plaintiff will allow Defendants' attorney to inspect all records of the company at its corporate headquarters at a mutually acceptable time. Plaintiff does provide these documents subject to all of the provisions of the protective order and will designate the documents once Defendants identify the documents it finds relevant and of which it elects to copy.

**REQUEST NO. 49**

Please produce all Documents Concerning Plaintiff's offer for sale or marketing of products covered by or made in accordance with one or more claims of the Asserted Patens, including without limitation all toy catalogs, toy catalog supplements, and toy fair marketing or promotional materials for the years 1994 through 2006. The documents sought by this request include Plaintiff's toy catalogs and toy fair promotional materials in their entirety, and not only excerpts of these materials as Plaintiff produced in PLVN 1-4, 11-14 and 34-176.

**RESPONSE**:

Plaintiff has included all toy catalogues with their Bates numbers in a CD accompanying this response. In addition, Plaintiff will, subject to its objections, provide for inspection and photocopying, pursuant to Rule 34, all relevant records which the Plaintiff certifies are kept only and solely in paper format in a storage room. Plaintiff will allow Defendants' attorney to inspect all records of the company at its corporate headquarters at a mutually acceptable time. Plaintiff does provide these documents subject to all of the provisions of the protective order and will

PLAY VISIONS, INC.'S RESPONSES TO
DEFENDANTS' SECOND REQUESTS FOR
PRODUCTION - 3

Civil Action No. C09-1769MJP

PLVN-6-1001P22RRFP02

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

designate the documents once Defendants identify the documents it finds relevant and of which it elects to copy.

DATED this 21st day of October, 2010

BLACK LOWE & GRAHAM<sup>PLLC</sup>

Mark L. Lorbiecki, WSBA No. 16,796
701 Fifth Avenue, Suite 4800
Seattle, WA 98104
T: 206.381.3300
F: 206.381.3301
Email: lorbiecki@blacklaw.com

*Attorneys for Play Visions, Inc.*

PLAY VISIONS, INC.'S RESPONSES TO
DEFENDANTS' SECOND REQUESTS FOR
PRODUCTION - 4

Civil Action No. C09-1769MJP

PLVN-6-1001P22RRFP02

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

## CERTIFICATE OF SERVICE

I certify that on October 21, 2010, I served a copy of PLAY VISIONS, INC.'S RESPONSES TO DEFENDANTS SECOND REQUESTS FOR PRODUCTION via email addressed as follows:

> Warren Rheaume
> John Goldmark
> DAVIS WRIGHT TREMAINE
> 1201 Third Avenue, Suite 2200
> Seattle, WA 98101
> warrenrheaume@dwt.com
> johngoldmark@dwt.com

s/Sarah Gist

PLAY VISIONS, INC.'S RESPONSES TO
DEFENDANTS' SECOND REQUESTS FOR
PRODUCTION - 5

Civil Action No. C09-1769MJP

PLVN-6-1001P22RRFP02

BLACK LOWE & GRAHAM PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

**EXHIBIT 3**

# BLACK LOWE & GRAHAM <sup>PLLC</sup>
## Intellectual Property Attorneys

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 ● F: 206.381.3301
blacklaw.com

October 22, 2010

**VIA EMAIL ONLY** warrenrheaume@dwt.com

Warren J. Rheaume
Davis Wright Tremaine LLP
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045

Mark L. Lorbiecki
Direct Dial: 206.903.1800
lorbiecki@blacklaw.com

Re:  Play Visions, Inc. v. Dollar Tree Stores, Inc. et al.
     Our Reference: PLVN-6-1001

Dear Warren:

As you are aware, we responded to your discovery requests and have made available to you all of the records of Play Visions, Inc. You may inspect them at a mutually convenient time and may flag any documents that you wish to have a service scan or copy for you. We have elected to respond to you by opening the doors so that we can remove any issues that might remain in your complaints regarding deficiencies in discovery. Because Play Visions still handles all of the purchase orders and deliveries by paper means, the extent of this disclosure is exhaustive and selected to moot all of your prior complaints about legibility or completeness of the records.

These records are stored in a well-lit and comfortable albeit unfinished portion of the Play Visions corporate offices where all of the records of the company are kept. I or an attorney from the office will be there to assure that you will not be required to communicate with my client or its employees or officers and to assure that we can facilitate your review in the most expeditious fashion.

If, on inspection, you desire a service to scan or copy, we suggest that you flag the documents and we will provide them to your service. In that fashion, my clients may preserve the order of their files which they retain for tax and business purposes. Similarly, we will designate the level of confidentiality of the documents based upon your flagging and scanning and at that time, we can assign Bates™ numbers to those documents.

I believe that your first impression will be that the volume of records seems small. To anticipate that concern, I point out that Play Visions is a smaller company and much of its business is done in a less formal manner than possibly that of your clients. Nonetheless, I can assure you that the collection is complete. If the documents you seek are not there, it is because they do not exist. It is our hope that by granting you the opportunity to scour all of the business records of the company, withholding nothing, we might be able to inject a bit more trust into the necessary


Patents
Trademarks
Copyrights
Technology Transfer
Litigation

Warren J. Rheaume, Esq.
October 22, 2010
Page 2

relationship between the litigants. It is, at least, the hope of Play Visions that you will recognize this gesture as the accommodation they intend it to be.

I trust that this resolves all of the outstanding matters relating to deficiencies in discovery at this point, except those in the pending requests for email that constitute your most recent request. Please contact me with possible dates and I will set them up for you.

Very truly yours,

BLACK LOWE & GRAHAM[PLLC]

Mark L. Lorbiecki

Cc:    Mark Chernick

**EXHIBIT 4**

**Mark Lorbiecki**

| | |
|---|---|
| **From:** | Mark Lorbiecki |
| **Sent:** | Thursday, November 04, 2010 10:37 AM |
| **To:** | 'johngoldmark@dwt.com' |
| **Cc:** | Warren J. Rheaume (warrenrheaume@dwt.com) (warrenrheaume@dwt.com); Miller, Anita (AnitaMiller@dwt.com); Ellen M. Bierman; Sarah Gist |
| **Subject:** | Inspection of Records |
| **Attachments:** | IMG00451-20101104-0953.jpg; IMG00452-20101104-0953.jpg |

John,

Tuesday and Wednesday of next week do work. Mark Chernick has given me some additional information as recently as this morning. I am immediately providing it to so that you may get a better feel for what the task entails. In the photos shown are all of the records on their palates. I understand that the palates are arranged to each contain 36 banker's boxes of records. In each banker's box, there are, on average, the files of 80 customer accounts. On average, each customer account contains 5 invoices per file for the year in question.

While I do not wish to, in any way, curtail your search, would you like to suggest the years you would like to start with so that we can get those boxes to the head of the line and on the floor. I emphasize that ever slip of paper is available to you, I just want to allow you to expedite your search so that you might best use your time.

Please let me know what steps you would like us to take to better assure your efficient and rapid search. Nothing in this document is meant to in any way limit that search, they are all there but we do not wish to, in any way, impede you.

My sincere thanks,

Mark L. Lorbiecki
BLACK LOWE & GRAHAM
701 Fifth Avenue, Suite 4800 - Seattle, Washington 98104
206.381.3300  Fax:  206.381.3301   www.blacklaw.com
DD: 206.903.1800  Cell: 206.290.7528   Google: 425.780.7528

Information in this private email message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any use, dissemination, distribution or copying is strictly prohibited. In case of erroneous delivery, please email the sender at "lorbiecki@blacklaw.com." Thank you in advance for your courtesy and cooperation.





**EXHIBIT 5**

**Mark Lorbiecki**

| | |
|---|---|
| **From:** | Goldmark, John <JohnGoldmark@dwt.com> |
| **Sent:** | Thursday, November 04, 2010 5:04 PM |
| **To:** | Mark Lorbiecki; Ellen M. Bierman; Sarah Gist |
| **Cc:** | Rheaume, Warren; Miller, Anita; Childs, Stephanie; Goldmark, John |
| **Subject:** | RE: Inspection of Records |

Mark,

Let's do Wednesday please, as that day works better for us.  How about 10:00 a.m.?

We would like to start by reviewing documents related to year 2003, and then work forward to more recent years up through 2006.

Additionally, and as we discussed, please make available for our inspection the following products sold by Play Visions:

1. Tentacoolz Ball or Knobbly Wobbly Ball, Item #260;
2. Mondo Galaxy Inside Out Ball, Item ## 785 or 869;
3. Inside-Out Ball or Bl-oops-ball, Item ## 689, 690, 692, 790, or 792;
4. Velvet Slime Anemone, Item # 9203;
5. Light Up Flashing Velvet Slime, Item # 9206;
6. Light Up Glow Urchin Ball, Item # 894;
7. Neon Urchin Ball, Item # 895;
8. Light Up Tentacle Molecule Ball, Item # 2479;
9. Light Up Molecule Ball, Item # 2490;
10. Light Up Fluorescent Molecule Ball, Item # 2491;
11. Light Up DNA Ball, Item # 2495;
12. Light Up DNA Quad Ball, Item # 2496;
13. Light Up Clown Nose, Item # 8900;
14. Light Up Animal Nose, Item # 8901;
15. Light Up Lava Balls, Item # 3600;
16. Light Up Hi-Bounce Ball, Item ## 9820, 4704, 4712, 4714, 4716;
17. Light Up Glow Flyer or Hyper-Flex Flyer, Item # 982;
18. Flashing Squish Yo-Yo, Item #1394A;
19. Tri-color Flashing Squish Yo-Yo, Item # 1393;
20. Light up Sushi Keychain, Item # 187;
21. Light Up Tropical Fish Keychain, Item #3255
22. Crystal Star Necklace or Crystal Star Bracelet, Item ## 364, 8925;
23. DNA Ball, Item # 2493;
24. Skull Horror Ball, Item # 77806;
25. Icky Yicky Frog Ball, Item # 62400;
26. Icky Yicky Eye Ball, Item # 72400;
27. Icky Yicky Fuzzy Rainbow Ball, Item # 32400;
28. Funky Face Ball, Item # 2499;
29. Spots & Dots Gel Ball, Item # 2482;
30. Glitter Bead Ball, Item # 2109; and
31. Mini Sphere Ball, Item # 2308.

Plaintiff has produced pictures depicting some of these products, but has not yet produced in discovery a representative sample of any of them.

We will plan on meeting at Play Visions headquarters in Woodinville on Wednesday, November 10 at 10:00 a.m., unless I hear differently from you.

Thanks.

John

**John Goldmark** | Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8068 | Mobile: (206) 240-1126 | Fax: (206) 757-7068
Email: johngoldmark@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** Mark Lorbiecki [mailto:lorbiecki@blacklaw.com]
**Sent:** Thursday, November 04, 2010 10:37 AM
**To:** Goldmark, John
**Cc:** Rheaume, Warren; Miller, Anita; Ellen M. Bierman; Sarah Gist
**Subject:** Inspection of Records

John,

Tuesday and Wednesday of next week do work. Mark Chernick has given me some additional information as recently as this morning. I am immediately providing it to so that you may get a better feel for what the task entails. In the photos shown are all of the records on their palates. I understand that the palates are arranged to each contain 36 banker's boxes of records. In each banker's box, there are, on average, the files of 80 customer accounts. On average, each customer account contains 5 invoices per file for the year in question.

While I do not wish to, in any way, curtail your search, would you like to suggest the years you would like to start with so that we can get those boxes to the head of the line and on the floor. I emphasize that ever slip of paper is available to you, I just want to allow you to expedite your search so that you might best use your time.

Please let me know what steps you would like us to take to better assure your efficient and rapid search. Nothing in this document is meant to in any way limit that search, they are all there but we do not wish to, in any way, impede you.

My sincere thanks,

Mark L. Lorbiecki
BLACK LOWE & GRAHAM
701 Fifth Avenue, Suite 4800 - Seattle, Washington 98104
206.381.3300  Fax:  206.381.3301   www.blacklaw.com
DD: 206.903.1800  Cell: 206.290.7528   Google: 425.780.7528

Information in this private email message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any use, dissemination, distribution or copying is strictly prohibited. In case of erroneous delivery, please email the sender at "lorbiecki@blacklaw.com." Thank you in advance for your courtesy and cooperation.

**EXHIBIT 6**

**Mark Lorbiecki**

| | |
|---|---|
| **From:** | Mark Lorbiecki |
| **Sent:** | Monday, February 14, 2011 6:28 PM |
| **To:** | Rheaume, Warren |
| **Cc:** | Goldmark, John; Ellen M. Bierman; Sarah Gist |
| **Subject:** | Re: Telephone Conference |

Warren,

The client wants to know if you can, actually deliver a mutual release in settlement. If so, i have settlement authority. If you cannot, I am to move to dismiss the patent causes with prejudice and to support the motion with a mea culpa declaration as to discovery and continue to press the trademark and copyright causes. Please let me know if your client will agree to a mutual release both sides to bear costs. Naturally such a release allows your client to sell the retained inventory.

Mark


On Feb 14, 2011, at 4:24 PM, Rheaume, Warren wrote:



Thanks for the update.


Warren Rheaume | Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8265 | Fax: (206) 757-7265
Email: warrenrheaume@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From**: Mark Lorbiecki <lorbiecki@blacklaw.com>
**To**: Rheaume, Warren; Goldmark, John
**Cc**: Ellen M. Bierman <ebierman@blacklaw.com>; Sarah Gist <sgist@Blacklaw.com>
**Sent**: Mon Feb 14 16:15:01 2011
**Subject**: Telephone Conference

Warren,

I did get a chance to speak with Mark Chernick and to convey much of the content of our meeting on Friday. He understood what I was explaining and the gravity of the discussion. He has to speak with his other two owners. I told him that I was going to be carrying my cell phone and that he could feel free to call me at any time. So while I know no more about the likely response than I did on Friday, I do know that it is being discussed. I should expect to have an answer to your offer within 24 hours.

My sincere thanks,

Mark L. Lorbiecki

BLACK LOWE & GRAHAM
701 Fifth Avenue, Suite 4800 - Seattle, Washington 98104
206.381.3300  Fax:  206.381.3301  www.blacklaw.com
DD: 206.903.1800  Cell: 206.290.7528   Google: 425.780.7528

Information in this private email message may be privileged,
confidential and protected from disclosure. If you are not the
intended recipient, any use, dissemination, distribution or copying is
strictly prohibited. In case of erroneous delivery, please email
the sender at "lorbiecki@blacklaw.com." Thank you in advance for
your courtesy and cooperation.