UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PLAY VISIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DOLLAR TREE STORES, INC., and GREENBRIER INTERNATIONAL, INC., <br><br> Defendants. | CASE NO. C09-1769 MJP <br><br> ORDER DISMISSING CASE |

This matter comes before the Court on the following motions: (1) Plaintiff's motion for voluntary dismissal (Dkt. No. 118); (2) Defendants' motion for discovery sanctions (Dkt. No. 122); and (3) Defendants' motion for attorneys' fees and fee petition (Dkt. Nos. 137, 139). Having reviewed the motions, the responses (Dkt. Nos. 126, 131, 141, and 142), the replies (Dkt. Nos. 129, 133), and all related papers, and having heard oral argument on May 10, 2011, the Court GRANTS the motion for dismissal with prejudice, GRANTS the motion for discovery sanctions, and DENIES the motion for attorneys' fees. The Court also FINDS AS MOOT Plaintiff's three motions for summary judgment. (Dkt. Nos. 64, 69, 75.)

**Background**

In the early stages of this Patent, Copyright, and Trademark dispute, Plaintiff Play Visions, Inc. saw itself as holding "David's five stones against the Dollar Tree Goliath." (Dkt. No. 138-1 at 5.) Unfortunately for Play Visions, its prosecution of this matter has not led to same biblical triumph David enjoyed against Goliath. After a year-and-a-half of contentious litigation, Play Visions has moved to voluntarily dismiss its case with prejudice. Defendants Dollar Tree Stores, Inc. and Greenbrier International, Inc. (collectively "Dollar Tree" or "Defendants") do not oppose dismissal, but they seek sanctions for what they believe is a pattern of sanctionable discovery misconduct. Defendants separately request a statutory award of fees and costs.

A.   <u>Discovery-related Issues</u>

On December 11, 2009, Play Visions filed suit against Dollar Tree pursuing Patent, Copyright, and Trademark claims with respect to a variety of novelty toys. In June, 2010, Defendants propounded their first discovery requests. In part, Defendants asked for "all Documents Concerning the first manufacture, use, sale, offer for sale, placing on sale, offer to license, public disclosure, description in printed publication or public use of any product covered by or made in accordance with one or more claims of the Asserted Patents." (Dkt. No. 83-1 at 7.) Thirty days later, Plaintiff responded by producing 365 pages of materials responsive to this request. (Dkt. No. 83-1 at 36.) Included in these materials was an invoice from a supplier to Plaintiff for an order of goods related to the '341 patent. (PLVN317.) On August 10, 2010, Defendants sent Plaintiff a letter complaining of fourteen areas of inadequate production, including a lack of emails related to the asserted patents, trademarks, and copyrights, and a lack

of documents as to inventorship and the patent application process.  (Dkt. No. 83-1 at 72-77.)
Defendants did not complain of a lack of documents as to the first sale of the products.

On September 21, 2010, Defendants propounded a second set of requests for production.
(Dkt. No. 83-1 at 92-99.)  Defendants asked for "all Documents Concerning Plaintiff's
importation, distribution, or sale of any product covered by or made in accordance with one or
more claims of the Asserted Patents, including without limitation all bills of lading, quote sheets,
packing lists, invoices, and purchase orders."  (Dkt. No. 83-1 at 95.)  This was a decidedly larger
discovery request from the first one in June related to first sale documents.  On October 21,
2010, Plaintiff responded and certified that "all relevant records . . . are kept only and solely in
paper format in a storage room" and permitted Defendants "to inspect all records of the company
at its corporate headquarters at a mutually acceptable time."  (Dkt. No. 83-1 at 110.)  On
November 4, 2010, Plaintiff's counsel wrote an email to Defendants explaining that the records
were kept in bankers' boxes arranged on palates, and he attached several photos of the palates.
(Dkt. No. 83-1 at 121.)  Plaintiff's counsel did not suggest that he or anyone at the company had
actually searched for responsive documents within the boxes or segregated any materials.

On November 10, 2010, Defendants traveled to Play Visions' headquarters to inspect the
paper records.  Defendants were greeted by 360 bankers' boxes, and objected to being forced to
comb through each box to find responsive documents.  (Dkt. No. 83-1 at 130.)  Plaintiff agreed
that it was not Defendants' responsibility to search for the responsive documents, but that Jay
Keron, the CFO of Play Visions, would assist in searching for the documents upon his return
after November 17, 2010.  (Id.)  According to a letter sent by Defendants, Plaintiff's counsel also
stated that he relied entirely on Play Visions' CEO, Mark Chernick, to identify all documents
responsive to Defendants' first request for production.  Defendants' letter also reported that

Plaintiff's counsel had not visited or become acquainted with Plaintiff's document storage systems. (Id. at 131.) For the first time Defendants also voiced their belief that Play Visions' production of documents as to the first sale of the products was inadequate. (Id.) Defendants' counsel also wrote to Plaintiff to request production of documents relating "the true authorship" of Plaintiff's proposed Markman expert report attributed to Play Visions' CEO, Mark Chernick. (Dkt. No. 83-1 at 125-27.)

On November 22, 2010, Plaintiff produced a spreadsheet that purported to reflect the contents of responsive documents stored in the 360 bankers' boxes at Play Visions' headquarters. (Dkt. No. 86 at 1.) Defendants objected to the spreadsheet as a substitute for the actual documents they had requested. (Dkt. No. 83-1 at 136.) Defendants also expressed their belief that the spreadsheet showed Plaintiff had withheld documents showing the first sale of devices practicing the patents. (Id.) Plaintiff responded by claiming that the spreadsheet shows "all sales data for each of the items John Goldmark [Defendants' counsel] identified" and that the spreadsheet "documents every sale of each of those toys." (Dkt. No. 83-1 at 140.) Plaintiff denied that it withheld any first sale documents, but agreed that Defendants had "legitimate complaints about several documents that we do owe you," without specifying which ones. (Id. at 141, 143.) On January 10, 2011, Defendants wrote to Plaintiff, arguing that the spreadsheet only showed Plaintiff's sales of products, not Plaintiff's "upstream acquisition of all products that practice any claim of the Asserted Patents." (Dkt. No. 83-1 at 174.)

On January 13, 2011, Plaintiff filed three motions for partial summary judgment. (Dkt. Nos. 64, 69, 75.) One week later, on January 20, 2011, Plaintiff delivered to Defendants a DVD containing over 30,000 invoices that were described in the spreadsheet. (Dkt. No. 83-1 at 176.) Plaintiff also promised Defendants "disks containing all of those documents" showing

1  transactions from vendors supplying Play Visions with the products at issue by January 24, 2011.

2  (Id.)  Plaintiff's counsel wrote that "all of your discovery to date has been satisfied."  (Dkt. No.

3  98-1 at 2.)  This was the first time Defendants learned that Plaintiff possessed electronic copies

4  of invoices and other documents responsive to the first and second requests for production,

5  despite Plaintiff's consistent certification that only paper copies existed.  (Compare Keron Dep.

6  at 50-51, 102-103 with Dkt. No. 83-1 at 110.)  On January 25, 2011, Plaintiff produced another

7  2,000 pages of documents.  (Dkt. No. 83-1 at 180.)  Defendants responded to this production on

8  January 26, 2011, complaining that Plaintiff had not produced first sale documents covering the

9  75 products allegedly practicing the asserted patents, despite the production of 30,000 pages of

10 invoices.  (Dkt. No. 83-1 at 179.)  Defendants then filed a motion to continue their responses to

11 the motions for summary judgment, after Plaintiff refused to consent to an extension.  (Dkt. No.

12 82.)  On March 1, 2011, the Court granted the request, finding the late revelation of documents

13 required a continuance.  (Dkt. No. 125.)  On January 29, 2011, Plaintiff's counsel emailed

14 Defendants to state that he had found an additional 11,000 invoices that he intended to turn over

15 to Defendants.  (Dkt. No. 98-1 at 6.)

16     On February 8, 2011, Plaintiff revealed that it had come into possession of eight disks of

17 data, including emails "between Play Visions and its Chinese suppliers."  (Dkt. No. 123-1 at 34.)

18 The discs also contained documents showing "the earliest sales of each of several of the devices

19 that practice the patents."  (Id.)  Counsel acknowledged that "[w]hile this does not completely

20 fulfill your request, it is progress and is most [sic] immediate assistance to you in evaluating the

21 invalidity issues."  (Id.)  The parties held a meeting pursuant to Local Rule CR 37 on February

22 11, 2011, and three days later Plaintiff proposed to offer a mutual release in settlement.  (Dkt.

23 No. 119 at 2, 8.)  Defendants did not accept the offer, choosing instead to depose Plaintiff's

24

30(b)(6) deponent knowledgeable of Play Visions' document retention system and discovery responses.

On February 22, 2011, Defendants deposed Jay Keron, who had been selected by Plaintiff as the 30(b)(6) deponent most knowledgeable about Plaintiff's document storage and discovery production. (See Dkt. No. 123-1 at 1-22; Dkt. No. 96-1 at 15; Dkt. No. 123-1 at 34 and 49.) Keron revealed several inconsistencies in Plaintiff's production of documents and explained that many of the certifications were false or inaccurate. Keron testified that Plaintiff's certification in July 2010 that it possessed only paper records of first sale documents was "inaccurate," but not false. (Keron Dep. at 64-65.) He testified that that Mark Chernick, the CEO of Play Visions, "didn't know where to look" to find electronic records. (Id.) Regardless, Play Visions waited until the Fall of 2010, to ask Tom Lawrence, its IT consultant, if he could search for and produce electronic documents. (Keron Dep. at 68.) Apparently Lawrence knew that this information existed, but no one bothered to ask him to search for it. (Keron Dep. at 104.) In January 2011, Lawrence found that he could review an electronic database to collect older records that were believed only to exist in paper form. (Keron Dep. at 68, 94.) According to Keron, it was simply Play Visions' failure to ask Lawrence or anyone else to run the electronic search that delayed the location and disclosure of the additional invoices. (Keron Dep. at 105.) Thus, Play Visions' certification in its October 21, 2010 response to Defendants' RFP, that "all relevant records . . . are kept only and solely in paper format in a storage room" and that all records had been produced, was false. (Dkt. No. 83-1 at 110.) Keron conceded that it was incorrect, though it was made to the best of the company's knowledge. (Keron Dep. at 79-80.)

Keron also testified that counsel provided little assistance to Play Visions in making responsive discovery productions. (See Keron Dep. at 18, 48, 70-71, 83.) Specifically, Keron

1 testified that counsel was not involved in identifying records custodians, did nothing to

2 familiarize himself with Play Visions' document retention and destruction policies, and did not

3 assist in searching for or responding to Defendants' first or second requests for production. (Id.)

4 This testimony reaffirmed Defendants' representation that Plaintiff's counsel relied on his client

5 entirely to make responses to discovery requests.

6 B.     Expert Report

7 Defendants claim that Plaintiff created a fraudulent expert report in anticipation of the

8 Markman hearing.

9 Mark Chernick, Play Visions' CEO, ostensibly authored an expert report Plaintiff

10 proposed to use at the Markman hearing. Play Visions served a copy of the report to Dollar Tree

11 on August 31, 2010. (Dkt. No. 138-1 at 40-58.) However, after Dollar Tree deposed Chernick

12 on September 27, 2010, Plaintiff elected not to use the report. At his deposition, Chernick

13 testified that he and counsel had had many conversations over several months about the

14 definitions of the terms of the patents and that they worked together to produce the report, but

15 that he did not draft it. (Chernick Dep. at 36-38, 40.) They created the report by sitting down

16 together and, using a "template of some previous similar reports, . . . [Chernick] would answer to

17 some issues about whether certain features of certain properties of some of the products that

18 were being discussed. . . ." (Id. at 36:11-15.) Chernick testified that the sit-down meeting

19 occurred one-and-a-half or two weeks before the deposition and that the first time he saw the

20 final draft of the expert report was one-and-a-half to two weeks before the deposition. (Id. at 36-

21 38, 39:18-21.) When asked "[w]hen did you first see Mr. Lorbiecki's attempt to put together an

22 expert report for your review," Chernick responded "about a week, a week ago probably[.]" (Id.

23 at 41:12-16.) Chernick consistently testified that he had signed and reviewed the report a week-

24

and-a-half prior to his deposition on September 27, 2010. This suggested that Chernick did not see the final report until after Plaintiff's counsel circulated a signed copy of the report to Defendants. Chernick admitted that he did not make any written changes to the report, but that he orally made edits and presented his views to counsel. (Id. at 42-43.) He also testified that he did not write any part of the expert report. (Id. at 43:17-23.) He stated that "[a]s I said, I'm not qualified to write a legal document. I wouldn't attempt that." (Id. at 43:22-23.)

After his deposition, Chernick submitted a list of changes to his deposition testimony that purported to correct his testimony. (Dkt. No. 138-1 at105-110.) The changes were not accompanied by any explanation as to the reasons for the changes. The thirty-one changes altered several material points, often changing a "yes" answer to a "no" answer. (See, e.g., id. at 107.) For example, Chernick changed his testimony that he first saw the final version of his expert report at counsel's office one-and-a-half or two weeks before his deposition to claiming he received an email copy of the report in the last days of August. (See Dkt. No. 138-1 at 106-08.) The corrections were not merely as to the timing of when Chernick saw the report. He also changed his testimony as to what documents he reviewed that prior to his deposition. (Dkt. No. 138-1 at 106, 109.)

Chernick has now submitted a declaration in which he has explains the reasons for the changes, stating that "my initial deposition testimony did not match my later recollections." (Chernick Decl. at ¶ 3 (Dkt. No. 144).) He states that he did not lie, but that he "simply did not remember the correct dates at the time of [his] deposition." (Id.) He claims he "was confused between all of the different types of legal documents [he] was being shown and [] was flustered by the deposition process." (Id.) He also takes pains to clarify that when testified he did not write the report he was considering only the act of physically typing up the document. (Id. ¶ 5.)

He claims he and counsel "had numerous discussions on the terms at issue in the patens and Mr. Lorbiecki documented [his] opinion in the proper legal format" which Chernick then "reviewed and corrected." (Id.) Chernick declares that he reviewed the expert report and signed it on August 31, 2010. (Id. ¶ 7.)

C. Protective Order Violation

Defendants also highlight Play Visions' violation of the protective order the Court approved in this case, a violation Play Visions does not contest. The protective order required each party to disclose any proposed expert and wait five days before sending that expert any confidential or highly confidential information. (Dkt. No. 33 at ¶ 8(a).) One of the good cause reasons for a party to object to a proposed expert was on the basis that he or she "works for a competitor of the party [or] there is a reasonable likelihood that the proposed expert . . . will use or disclose [sensitive] information . . . ." (Id.)

On January 27, 2010, Play Visions served Dollar Tree with an expert report on damages that Thomas Lawrence authored. (Dkt. No. 138-1 at 120-21.) Lawrence, who searched for and found electronic records for Plaintiff, has provided IT assistance to Plaintiff for over ten years and maintains Play Visions' financial software. (Id. at 121.) In preparing his report, Lawrence reviewed confidential documents Dollar Tree produced, including bills of lading, invoices, and funds wiring advisements. (Id. at 120.) Play Visions gave no advance notice to Dollar Tree that Lawrence would be an expert or would review confidential materials. Upon learning of the Lawrence report, Dollar Tree immediately contacted Play Visions to object to the disclosure of confidential materials and Play Visions' failure to obtain approval of Lawrence as an expert as required by the protective order.

1     Play Visions did not dispute that it violated that protective order. Play Visions quickly disclosed that Chernick and Keron received copies of the expert report from Lawrence. Counsel for Play Visions asked Lawrence, Keron, and Chernick to destroy all copies of the expert report, and counsel has certified that all copies of the report were destroyed as well as the documents Lawrence reviewed. (Dkt. No. 143 at 16, 28-29.) In response to these certifications, Dollar Tree's counsel stated that "based on what your investigation has determined, with written certification from those who received Dollar Tree's information and withdrawal of Mr. Lawrence's report . . . I think we can consider the dispute closed." (Dkt. No. 143-1 at 31.) However, Dollar Tree maintains that it has asked for and not received written certifications from the persons who viewed the information—not simply counsel.

**Analysis**

A.     <u>Sanctions for Discovery Abuses</u>

    The Court agrees with Dollar Tree that discovery sanctions are proper.

    Under Rule 26(g)(3), the Court must sanction a party who submits a "certification [that] violates this rule without substantial justification." Rule 26(g) "allows the court to impose sanctions on the signer of a discovery response when the signing of the response is incomplete, evasive or objectively unreasonable under the circumstances." <u>St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.</u>, 198 F.R.D. 508, 515 (N.D. Iowa 2000). The Court's sanction "may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g). Courts apply an objective standard to determine whether the rule has been violated; the rule requires that the attorney make a reasonable inquiry into the factual basis of his response, request or objection. <u>Id.</u>, 1983 adv. com. notes. The purpose of the rule includes "enabl[ing] counsel for both sides to make the same realistic appraisal of the case,

1 so that settlement and litigation strategy are based on knowledge and not speculation." Fed. R.

2 Civ. P. 26, 1970 adv. com. notes, subd. b(2) (the former location of current Rule

3 26(a)(1)(A)(iv)).

The Court has previously shifted attorneys' fees pursuant to Rule 26 for discovery abuses. See Aecon Bldgs., Inc. v. Zurich N. Am., No. C07-832 MJP, 2008 U.S. Dist. LEXIS 65784, at *13 (W.D. Wash. Aug. 20, 2008). In Aecon the Court found sanctionable one party's failure to produce insurance policies that were perhaps not specifically asked for by the requesting party, but that were nonetheless relevant. The Court awarded attorneys' fees and costs in brining the motion. Id., at *14. Play Visions argues incorrectly that sanctions are not proper because Dollar Tree did not bring a motion to compel and did not meet and confer pursuant to Local Rule CR 37. First, there is no requirement that a party file a motion to compel before filing a motion for discovery sanctions. Second, as the Court in Aecon made clear "[n]either the federal nor the local procedural rules require that a party meet and confer prior to bringing a sanctions motion under 26(g)." Id. at *8. The Court thus rejects Play Visions' procedural arguments.

The Court also possesses inherent authority under Rule 41(a)(2) to condition dismissal on any terms it considers proper. The Court has discretion in fashioning appropriate terms and conditions. Smith v. Lenches, 263 F.3d 972, 976 (9th Cir. 2001). The Court invokes this rule as a secondary basis on which to award discovery-related sanctions to Defendants. The Court is aware that terms under Rule 41 cannot be levied against counsel. See Hecktron v. Sunan Corp., 992 F.2d 240, 242 (9th Cir. 1993). As explained below, sanctions are imposed jointly and severally on Plaintiff and Plaintiff's counsel pursuant to Rule 26 alone.

Several of Play Visions' actions during discovery merit the imposition of sanctions: (1) Play Visions' failure to make full and complete disclosures and false certifications with regard to first sale documents requested by Dollar Tree's first request for production; (2) Play Visions' inadequate and delayed response to Dollar Tree's second requests for production; (3) Play Visions' false certifications that it did not possess electronic records and its failure to search for them in a timely manner; (3) Play Visions' counsel's failure to assist and guide his client's production of discovery responses; (5) Play Visions' counsel's questionable conduct in drafting the Markman expert report ascribed to Chernick and the attempts to change Chernick's deposition testimony; and (5) Play Visions' violations of the protective order.

The record makes clear that Play Visions' response to Dollar Tree's first requests for production was not complete. Play Visions certified that it produced all first sale documents responsive to the request. It turns out that other documents showing first sale of items practicing the patents were available to Play Visions and stored within its control. (See Goldmark Decl. ISO Rule 56(d) Motion Exs. A & B.) Plaintiff also falsely certified that it only had paper records of documents related to the first sale, which Keron affirmed was inaccurate. (Keron Dep. at 64-65.) In February 2011, Play Visions revealed that it in fact had other documents showing the first sales of devices practicing the patents. (Dkt. No. 123-1 at 34.) In February, 2011, Play Visions also provided a major cache of emails regarding first sales of the products well after it falsely certified on September 21, 2010 that "we have withheld nothing" with regard to emails. (Dkt. No. 83-1 at 90.) This appears to have been due only to Play Visions' failure to perform adequate and timely searches of its emails stored on employees' computers. (Keron Dep. at 32-33, 48-49, 99, 116.) These false certifications hindered Dollar Tree's ability to defend itself in this litigation and to respond to Plaintiff's motions for summary judgment.

The Court is not persuaded by Dollar Tree's argument that had Plaintiff "undertaken any reasonable inquiry for responsive documents" it would have produced on July 7, 2010, the 51,000 documents it finally began producing on January 20, 2011." (Dkt. No. 122 at 12 (bold and italics removed).) Dollar Tree gives itself too much credit as to the breadth of its first request for production. It was not until September 2010 that Dollar Tree made a different, broader request that lead to the production of over 51,000 documents. While Play Visions should have produced more documents and emails in response to Dollar Tree's first requests for production, it was not clearly required to provide the 51,000 documents. Accordingly, the Court cannot agree with Dollar Tree that all of the costs related to its investigation regarding invalidity, travel to China for research, use of consultants, interviews with third parties, and discovery communications necessarily arose out of Play Visions' inadequate response to the first requests for production. (See Dkt. No. 122 at 12.) Only some of the costs and fees Dollar Tree incurred as a result of the inadequate productions are appropriately shifted—not all of them.

Play Visions further abused the discovery process in its response to Dollar Tree's second requests for production. First, the Court is not convinced that Play Visions and its counsel ensured that the documents within the 360 bankers' boxes made available at Play Visions' warehouse were responsive. While there is nothing inherently improper in producing boxes of records (as was common practice before the creation of electronic records), Play Visions and its counsel appear not to have ensured that the documents contained in the boxes were responsive, and they made no efforts to segregate the documents. Ultimately, Play Visions agreed that Dollar Tree should not have been forced to search for the needle in the haystack and ultimately prepared a narrowly-tailored production. (Dkt. No. 83-1 at 141.) Second, Play Visions falsely certified that it only kept records responsive to Dollar Tree's second requests for production in

paper form. (Dkt. No. 83-1 at 110.) As Keron testified, this was incorrect. (Keron Dep. at 79-80.) Play Visions goes to lengths to suggest that it had to write a computer program to search its own records to produce electronic records. Regardless of whether this is true, Play Visions failed to determine whether electronic records existed until late in 2010, well after electronic records were requested in June 2010. Third, Play Visions' response also revealed that counsel had not familiarized himself with how Play Visions stored documents and he did not assist his client in making document productions. (Dkt. No. 83-1 at 130-31.) This is evident in the manner in which the production was made, as confirmed by Keron's deposition. (See Keron Dep. at 18, 48, 70-71, 83.)

Plaintiff exacerbated the harm caused by its inadequate and delayed response to Dollar Tree's second request for production by filing three motions for summary judgment before revealing tens of thousands of relevant documents. Moreover, Play Visions continued to make false certifications even after it produced over 30,000 invoices responsive to Dollar Tree's second request for production. For example, on January 24, 2011, counsel wrote that "I am aware of no remaining deficiencies in production. . . [s]o, you are not missing any discovery." (Dkt. No. 98-1 at 2.) This was a material and misleading statement that disrupted Dollar Tree's ability to respond to the motions for summary judgment. Not five days later on January 29, 2011, Plaintiffs produced another 11,000 invoices. (Dkt. No. 98-1 at 6.) Two days later, on the day Dollar Tree filed its opposition briefs, Play Visions produced over 11,000 invoices that it previously claimed did not exist. (Dkt. No. 98-1 at 9-10.) On February 8, 2011, Play Visions made yet another late production, this time of eight discs of data containing emails between Play Visions and its vendors, research and development of the products, and emails between Play Visions' patent prosecutor. These documents were responsive not only to the second request for

production, but also the first.  According to Keron, many of the documents responsive to the first request for production were merely sitting in an employee's office.  (Dep. at 118-19.)  These false certifications and delayed productions violate the letter and spirit of the discovery rules.  At the very least, they caused Defendants to incur substantial costs and fees in filing a Rule 56(d) motion for continuance and hampered their ability to respond properly to Plaintiff's three summary judgment motions.

Throughout all of these discovery violations and missteps, Play Visions' counsel, Mark Lorbiecki, appears not to have abided by Rule 26(g)(1)'s requirement that his responses to the requests for production and other discovery requests were "formed after a reasonable inquiry."  Keron testified that counsel had little to no involvement in production of documents or familiarizing himself with Play Visions' document storage and retention systems.  Dollar Tree claims that Lorbiecki stated that he relied entirely on his clients to provide discovery responses.  The record strongly suggests counsel relied extensively on his client without making an independent inquiry into how documents were stored, and how thoroughly they were searched for and produced.  He did not take an active role in guiding his client in searching for records.  The slow trickle of documents produced shows that Lorbiecki's consistent false and/or misleading certifications that all documents had been produced were not the "formed after a reasonable inquiry."  Fed. R. Civ. P. 26(g)(1).  Counsel's lack of investigation as to what documents his client possessed caused innumerable delays and excess costs to Defendants, including those related to disputing the adequacy of discovery production, filing the motion to continue, the 30(b)(6) deposition of Plaintiff's CFO, and the motion for sanctions itself.  While counsel may trust his client, he must make a reasonable inquiry into whether his client's responses to discovery requests are adequate.  Counsel must also familiarize himself with the

1  documents in his client's possession before certifying that production is complete.  Here,

2  Lorbiecki repeatedly violated this obligation, which caused Defendants to incur additional costs

3  and fees in defending the matter without adequate responses to discovery requests.

4  The events involving the production of Mark Chernick's expert report and his subsequent

5  deposition included several instances of improper acts.  The Court is most dismayed by

6  Chernick's attempt to make wholesale reversals of his testimony under oath.  The "change sheet"

7  of thirty-one revisions to his testimony seems to ignore that he was under oath at his deposition

8  and that he had an obligation to testify truthfully.  This is evident in Plaintiff's failure to explain

9  the need to make such changes, as required by Rule 30(e)(1)(B).  See Hambleton Bros. Lumber

10 Co. v. Balkin Enters., Inc., 397 F.3d 1217, 1224-25 (9th Cir. 2005).  As the Ninth Circuit has

11 stated, "[a] statement of reasons explaining corrections is an important component of errata

12 submitted pursuant to FRCP 30(e), because the statement permits an assessment concerning

13 whether the alterations have a legitimate purpose."  Id.  If a deponent is unhappy with his or her

14 answers, he or she is not permitted to make material changes to the testimony through a change

15 sheet without at least some explanation.  The Court is also troubled by counsel's apparent lead

16 role in drafting and crafting the report attributed to Chernick.  From Chernick's testimony, it

17 appears counsel drafted the entire report himself based on discussions with Chernick, which

18 Chernick then reviewed and approved.  Chernick and Lorbiecki's declarations filed in opposition

19 to the motion for statutory fees supports a conclusion that Lorbiecki typed the materials based on

20 Chernick's statements and views.  While the Court does not believe the report is fraudulent, it

21 was not prepared in a manner the Court expects of an expert report.  An expert must

22 independently draft and edit his own report, not merely review counsel's idealized version of

23 what such a report may contain.  That Chernick was confused about when he may have

24

participated in the expert report's creation is evidence enough that his involvement was marginal in a process that he should have driven. This was not proper. The Court also questions the usefulness of an expert report drafted by the party itself, where its objectivity is easily questioned. Defendants should not have been forced to incur the costs of deposing Chernick and investing time in a rebuttal report. The Court factors this in to its sanction.

The Court also finds imposition of sanctions for violations of the protective order to be proper. Although counsel attempted to remedy the violation in a timely manner, the violation itself never should have happened. Counsel's carelessness in selecting Lawrence as the expert without abiding by the protective order he agreed to warrants a sanction. It is difficult for the Court to estimate what harm this visited upon Dollar Tree, and no distinct showing has been made. In fashioning a proper sanction, the Court will consider the fees and costs Dollar Tree generated in bringing the violation to light and resolving it, as well as bringing the motion for sanctions.

B.     Amount of Sanctions

The Court finds sanctions for the above misconduct of Play Visions and its counsel appropriate. The difficulty facing the Court is establishing the proper amount. In its motion for discovery sanctions, Dollar Tree did not specify what sum it desired as a proper remedy. The fee petition explained that Dollar Tree spent $499,219.31 in fees on discovery, and Defendants have asked for over $1.2 million in fees and costs to be shifted along statutory grounds. However, these amounts reflect all of the time Dollar Tree spent on discovery and defending the case, not just the time that was incurred because of the discovery abuses noted above. The Court has thus conducted its own analysis of Dollar Tree's counsel's billing records and has concluded that the appropriate award is $137,168.41.

The Court calculated this amount by examining the billing records and noting every instance where Dollar Tree's counsel performed work caused by Play Visions' misconduct. See Fed. R. Civ. P. 26(g). The Court then examined these billing entries to determine whether the work performed was reasonable and necessary. The Court also determined that the hourly rates charged were reasonable. In many instances the Court found only a portion of the hours billed for a particular entry to be reasonable and related to the discovery sanctions. This was particularly the case because the billing entries were not segregated as to individual tasks. The Court also reduced excessive hours billed, notably where single attorneys billing over 10 hours for one day's work. The Court is not convinced that the final hours billed in a 13 hour billable day reflect efficient and reasonable work product. The Court's analysis of the billing records and its calculation is included as Appendix A to this order. The Court also includes as compensable the deposition reporting costs related to the deposition of Plaintiff's Markman expert, Chernick. No other costs were included because Dollar Tree's billing records did not clearly reflect costs related to the misconduct.

The total amount is necessarily less than the total amount of fees Dollar Tree stated it spent on all discovery because not all of the work relates to the discovery misconduct. The amount is also notably lower than the entire $1.2 million in fees and costs requested by Dollar Tree that it expended in the entire litigation. As explained below, the Court does not find that all of the work performed by counsel for Dollar Tree to be properly shifted to Play Visions as a sanction. The reasonable fees and costs attributable to the misconduct the Court has noted above is $137,168.41.

The sanctions are to be born by Play Visions and its counsel jointly and severally pursuant to Rule 26. See e.g., Toth v. Trans World Airlines, Inc., 862 F.2d 1381 (9th Cir. 1988)

(rejecting a due process challenge to a sanction for violating Rule 37 imposed jointly and severally on counsel and client). The Court is convinced that much of the misconduct here could have been avoided had counsel properly managed his client and complied with his duties under Rule 26. Payment must be made within 15 days of entry of this order.

C.     Statutory Fee Request

The Court is not persuaded that the statutory shifting of attorneys' fees is proper in this case.

"The filing and maintaining of an infringement suit which the patentee knows, or on reasonable investigation should know, is baseless constitutes grounds for declaring a case exceptional under 35 U.S.C. § 285 and awarding costs, attorney fees, and expenses to the accused infringer." Eltech Sys. Corp. v. PPG Indus., Inc., 903 F.2d 805, 810 (Fed. Cir. 1990) (quotation omitted). "The prevailing party may prove the existence of an exceptional case by showing: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1034 (Fed. Cir. 2002). "Inadequacy of pre-filing preparation may be relevant to the 'exceptional' case question." Id. at 1035. "Litigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285." Rambus Inc. v. Infineon Techs. Ag, 318 F.3d 1081, 1106 (Fed. Cir. 2003). "[T]he interest of the patentee in protecting his statutory rights is balanced by the interest of the public in confining such rights to their legal limits." Eltech, 903 F.3d at 810.

The Court does not find that the discovery violations in this case merit finding the entire case exceptional under 35 U.S.C. § 285. Play Visions' conduct has not been above reproach, but it has not so clearly permeated the entire case or its merits. The Court is not convinced that the

discovery misconduct merits shifting all of the fees.  Moreover, there has been no finding of invalidity as to any of the patents, and the Court cannot say that on the face of the documents Dollar Tree has provided that the patents themselves are invalid.  The case does not appear frivolous or baseness.  Play Visions maintains that its suit has merit, but that it is not fiscally prudent to continue litigation because the amount of recovery is significantly less than what it anticipated.  The Court accepts Play Visions' belief that the continued litigation is financially unsound.  The Court is particularly receptive to Play Visions' argument that a party should not be forced to litigate a meritorious claim that proves fiscally unsound to pursue merely to avoid the shifting of fees and costs.  The Court does not find the shifting of attorneys' fees necessary or proper under § 285 or any of the other grounds urged.  Sanctions for the discovery abuses adequately and properly address the misconduct at issue.

The Court therefore DENIES Dollar Tree's motion for attorneys' fees and costs.

**Conclusion**

The Court DISMISSES the action with prejudice and GRANTS Plaintiff's unopposed motion for voluntary dismissal.  The Court GRANTS Defendants' motion for sanctions, and imposes sanctions in the amount of $137,168.41 on Play Visions and its counsel jointly and severally.  The Court DENIES the motion for statutory fees.  The Court FINDS AS MOOT Plaintiff's pending motions for summary judgment.  (Dkt. Nos. 64, 69, 75.)  Sanctions must be paid within 15 days of entry of this order.

Dated this 8th day of June, 2011.

Marsha J. Pechman
United States District Judge